Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 748 | **DATE** | 1/16/2004 |
| **CASE TITLE** | United States of America vs. Michael Lee | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing is set for 1/21/04 at 9:30AM.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendant Michael Lee's Motion to Suppress Arrest and Evidence [20-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JAN 20 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 23 |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03-CR-748 |
| v. | ) | |
| | ) | |
| MICHAEL LEE | ) | Judge Joan B. Gottschall |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Michael Lee is charged in a one-count indictment with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Lee argues that his arrest on the weapons charge is unconstitutional and has moved to suppress certain incriminating statements he allegedly made to police officers on the night of his arrest as well as a firearm recovered by police officers during an allegedly unconstitutional pat-down search of Lee's person. On January 8 and 9, 2004, the court conducted a hearing on Lee's motion. For the reasons stated below, Lee's motion to suppress is granted.

## BACKGROUND

On the evening of March 22, 2003, the Chicago Police Department received an anonymous tip that a "male black" was sitting in a red sedan with a gun in his hand in a parking lot at 1836 S. Karlov Street. The tip provided no further description of the suspect and no other information regarding the circumstances of the offense. At approximately 7:15 PM, Officers Ronald Zuniga and

Frank Sarabia, who were on patrol in the area, were dispatched to 1836 S. Karlov to respond.[1]

The building at 1836 S. Karlov Street is part of a residential complex known in the community as "the Square." The complex is composed of a series of apartment buildings which form a square enclosing a central parking lot. On the east side of the Square, a driveway connects the parking lot with Karlov Street. The driveway is the only route for cars to enter and exit the lot. At the hearing on the motion to suppress, the government contended that the vicinity of 1836 S. Karlov is known to police officers as a particularly high crime area. Officers Sarabia and Zuniga both testified that they have conducted numerous arrests in the area for violent offenses, weapons possession, narcotics trafficking and gang activity.

Officers Zuniga and Sarabia reached the Square within minutes of receiving the anonymous tip and entered the parking lot through the driveway on Karlov street. The officers testified that they immediately noticed a red sedan parked at the south end of the parking lot. The officers drove slowly past the red sedan and directed the patrol car's searchlight at the occupants. Zuniga and Sarabia both testified that, during this pass, they could see a woman – later identified as Lashonda Carradine -- seated on the driver's side of the red sedan and a child in a safety seat in the rear seat. The officers did not see anyone else in Carradine's vehicle. The officers consequently shifted their focus to a maroon sedan on the other side of the lot, approximately 30 to 45 feet from Carradine's car. The officers drove to the north side of the lot, determined that the maroon sedan was empty, executed a three-point turn and proceeded back towards Carradine's car. During a second pass of Carradine's vehicle, in addition to seeing Carradine and the child, the officers observed an African-

---

[1] For purposes of this ruling, the court accepts the sequence of events as testified to by Officers Zuniga and Sarabia.

American male – later identified as Lee – seated on the passenger side.

Upon seeing Lee, Officer Sarabia parked the patrol car in front of Carradine's vehicle to prevent her from leaving the lot. The officers exited their patrol car and approached Carradine's vehicle with their guns drawn. Zuniga and Sarabia ordered Lee and Carradine to exit the vehicle and to place their hands on the hood. Officer Sarabia testified that, after Lee complied with the officers' orders, Officer Zuniga twice asked Lee a question along the lines of "What have you got?" or "Where's it at?" Both officers testified that Lee's behavior at that point seemed "evasive." When asked to elaborate, Officer Sarabia testified that Lee did not answer Officer Zuniga's questions. Officer Zuniga provided no specifics. Officer Zuniga then handcuffed Lee and asked Lee whether he had a weapon in his possession. The government contends that, after he was handcuffed, Lee admitted that he had a gun in his front jacket pocket. In response to Lee's alleged admission, Officer Zuniga conducted a pat-down search of Lee and retrieved a loaded handgun from Lee's jacket. Officer Zuniga placed Lee under arrest and read him his *Miranda* rights. The government alleges that, shortly after the arrest, Lee told Officer Zuniga that Carradine "didn't know I had it when I got in. I use it for protection."

## ANALYSIS

Lee argues that his detention and the subsequent pat-down search of his person were unconstitutional and that, therefore, his arrest, his alleged incriminating statements to police during the arrest, and the handgun retrieved by the arresting officers during the search must all be suppressed. The parties disagree regarding the proper standard for evaluating whether the officers' stop and search of Lee passes constitutional muster. Lee argues that, because he was handcuffed at gunpoint prior to the search, the officers' conduct constituted a custodial arrest, requiring probable

-3-

cause and implicating the Fifth Amendment protections of *Miranda v. Arizona*, 384 U.S. 436 (1966). The government counters that, rather than instituting a full-fledged arrest, the officers were merely conducting an investigative *Terry* stop, which requires only a reasonable suspicion of wrongdoing. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Because the officers' conduct in this case falls short of the less stringent *Terry* standard, the facts here do not require the court to resolve this question.

A police officer may briefly detain an individual in an investigative *Terry* stop if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *Terry*, 392 U.S. at 21-22. The *Terry* standard is satisfied if, at the time of the stop, "specific and articulable facts," along with the officer's reasonable inferences from those facts, reasonably warrant the stop. *Id.* at 21-22. The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27. Moreover, the reasonableness of a particular stop depends on the extent of the restraint on the suspect's rights; a stop is reasonable only if the degree of suspicion is adequate in light of the degree of the intrusion. *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir. 1993). While the quantum of suspicion required depends on the circumstances of the individual case, as a general rule, the necessary degree of confidence increases with the degree of the intrusion. *United States v. Chaidez*, 919 F.2d 1193, 1198 (7th Cir. 1990).

In evaluating Lee's motion, therefore, the court must consider the degree of the restraint at issue. The intrusion in this case was more substantial than in an ordinary *Terry* stop. The officers approached Lee with guns drawn, ordered him from the vehicle and handcuffed him before conducting the pat-down search. Assuming that the officers' conduct did not constitute a custodial arrest, handcuffing a suspect at gunpoint is, nevertheless, at the "outer edge" of an investigative stop. *See Chaidez*, 919 F.2d at 1198; *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988).

Consequently, the level of suspicion required to justify the search here is greater than for less invasive investigative methods. *See Chaidez*, 919 F.2d at 1198.

The government argues that Officers Zuniga and Sarabia had reasonable suspicion sufficient to justify a *Terry* stop because: (1) Lee matched the description in the anonymous tip, (2) the stop occurred in a particularly high crime area and (3) the officers reasonably inferred that Lee was hiding because they did not see him when they first viewed the red sedan but observed him moments later on their second pass. The court concludes that, when viewed together under the totality of the circumstances, those three factors do not justify the stop and search of Lee.

The anonymous tip in this case of a "male black sitting in a red sedan with a gun in his hand," in and of itself, does not satisfy the reasonable suspicion standard. An anonymous tip, without further indicia of reliability, is not sufficient to justify an investigative *Terry* stop. *Florida v. J.L.*, 529 U.S. 266, 271-74 (2000). The fact that Lee matched the bare-bones physical description in the tip is not enough. "An anonymous tip must be reliable in its assertion of illegality, not just in its tendency to identify a determinate person, if it is to provide reasonable suspicion for a *Terry* investigatory stop." *J.L.*, 529 U.S. at 272. As in *J.L.*, the tip in this case described the suspect but provided no other information that would allow the police to substantiate the tip's claim of illegal conduct. The tip, therefore, does not alone provide sufficient cause for Lee's detention.

The additional fact that the stop occurred in a high crime area, while an important factor in the court's analysis, does not tip the balance in favor of reasonable suspicion. The government presented convincing evidence that the vicinity around 1836 S. Karlov Street is a relatively high crime area. While a person's presence in a high crime area is not enough to support a reasonable, particularized suspicion of wrongdoing, it is "among the relevant contextual considerations in a

*Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, the government does not argue for, and the court does not find, a high crime area exception to the United States Supreme Court's ruling in *J.L.* The high crime area in this case is a large residential complex where dozens of citizens go about their daily lives. Those residents are entitled to substantially the same constitutional protections as the defendants in *J.L.* Consistent with *J.L.*, in a *Terry* analysis, the weight given to an anonymous tip must hinge on its reliability, not on the character of the neighborhood the suspect calls home. To rule otherwise would allow police officers to stop anyone living in a high crime area based solely on unsubstantiated information provided from unknown sources.

The determining factor in this case, therefore, is whether – in light of the tip and the nature of the neighborhood – the search was justified by the officers' inference that Lee hid from them during their search of the parking lot. In support of its argument, the government has cited several cases holding that evasive behavior in a high crime area can justify an investigative *Terry* stop. (Gov't Resp. at 4-6, citing *Wardlow*, 528 U.S. at 124; *United States v. Woodrum*, 202 F.3d 1, 7 (10th Cir. 2000); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998); *United States v. Sims*, 296 F.3d 284, 286-87 (4th Cir. 2002).)

However, the inference that Lee was hiding has no weight in the *Terry* analysis in this case because that inference was not reasonably derived from the facts available to the officers at the time of the stop. On its face, the inference does not seem reasonable: the government has offered no plausible explanation for why Lee would hide from the officers during their first pass of Carradine's vehicle only to sit up, watch the officers turn back towards Carradine's vehicle and then remain seated in full view of the officers during their second pass. More importantly, unlike the arresting

officers in each of the cases cited by the government, Officers Zuniga and Sarabia *did not actually witness any furtive gestures by Lee before conducting the stop*. Neither officer observed Lee crouch, pop up, duck or otherwise behave in an unusual manner. Rather, the officers simply saw Lee "just sitting there" in Carradine's car and assumed that the furtive gestures had previously occurred.[2] Without any supporting observations by the arresting officers, their assumption that Lee had been hiding is precisely the sort of "hunch" that cannot play a role in a *Terry* analysis.

The officers' inference that Lee was hiding cannot support the stop here for the additional reason that, unlike the cases cited by the government, the officers did not infer this furtive behavior until *after* they arrested Lee. While both officers testified that they were surprised to see Lee during their second pass of Carradine's vehicle, Officer Sarabia testified that it was not until after the arrest that he and Officer Zuniga recounted the events leading up to the stop and concluded that Lee must have been hiding when they first passed Carradine's car. (1/8/04 Sarabia Tr. 126-27.) Officer Sarabia testified that he did not hypothesize that Lee had been hiding until *after* the arrest. (*Id.*) The question whether the officers here had reasonable suspicion to detain Lee hinges on the information available to, and the reasonable inferences made by, the officers at the time of the stop. The officers' post-hoc assumptions regarding Lee's conduct are not relevant to that inquiry.

The court concludes that Officers Zuniga and Sarabia did not have sufficient reasonable suspicion to support a *Terry* stop in this case, especially in light of the intrusive nature of the stop. Because the stop from its inception violated Lee's Fourth Amendment rights, the evidence recovered by the officers as a direct result of the stop and search, including the weapon retrieved from Lee's

---

[2] The court finds credible Lashonda Carradine's testimony that Lee had not been hiding. Carradine testified that, when the officers passed her vehicle the second time, Lee had just returned to her car after taking her son behind a nearby tree to urinate.

jacket and the alleged incriminating statements made by Lee to the officers during the stop, must be suppressed.

## CONCLUSION

Lee's motion to suppress his arrest and to suppress the evidence retrieved on the night of that arrest is granted.

ENTERED:

JOAN B. GOTTSCHALL
United States District Judge

DATE: January 16, 2004